WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Realty Executives International Services LLC, | No. CV-17-02671-PHX-DGC |
| Plaintiff/Counterdefendant, | **ORDER** |
| v. | |
| Devonshire Western Canada Limited, et al., | |
| Defendants/Counterclaimants. | |

Plaintiff Realty Executives International Services LLC ("REI") alleges that Defendants Devonshire Western Canada Limited ("Devonshire"), Bill Tarrabain, Philippe Roy, Rick Rowswell, and Gary Kirkham breached a 2008 Regional Developer Agreement, committed tortious interference, and violated and the implied covenant of good faith and fair dealing. Doc. 16 at 13-16, ¶¶ 71-98.[1] Defendants assert similar counterclaims. Doc. 35 at 22-23, ¶¶ 99-108. The parties cross-move for summary judgment (Docs. 109, 114), the motions are fully briefed (Docs. 119, 124), and oral argument will not aid the Court's decision, *see* Fed. R. Civ. P. 78(b); LRCiv 7.2(f). For the reasons set forth below, the Court will grant Defendants' motion, deny REI's cross-motion on its claims, and grant in part REI's motion on Defendants' counterclaims.[2]

---

[1] Citations to documents in the Court's docket are denoted "Doc.," and page cites are to numbers placed at the top of each page by the Court's electronic filing system.

[2] REI has filed an unopposed motion for leave to file rebuttal evidence and facts in support of its cross-motion for summary judgment. Doc. 126. The Court will grant the motion and

## I. Background.

REI is an Arizona limited liability company and a successor entity to Realty Executives International, Inc. ("International"), an Arizona corporation. Doc. 16 at 1, ¶¶ 1-3. REI offers franchises to use its trademarked system for real estate services. Doc. 16 at 1, ¶¶ 1, 3. REI's system provides a compensation scheme for brokers and various intellectual properties owned by REI. *Id.* at 2, ¶ 4. REI licenses its system to regional developers, typically through regional developer franchise agreements ("RDAs") that allow the regional developers to offer, sell, develop, service, and support "Realty Executives" offices in the territory covered by their RDA. *Id.* ¶ 5.

Devonshire is a Canadian company organized under the laws of Alberta, Canada, with its principal place of business in Edmonton. It was a regional developer for REI. *Id.* ¶¶ 6-7, 42. The individual defendants – Tarrabain, Roy, Rowswell, and Kirkham – held equity interests in and were the managing owners of Devonshire. *Id.* at 3, ¶¶ 16-17.

In July 2003, Devonshire and REI executed an agreement providing for franchising operations by Devonshire in Alberta, Canada (the "2003 Agreement"). Doc. 110 at 2, ¶ 1. The 2003 Agreement had a five-year term – expiring July 2008 – and could thereafter be continued on a month-to-month basis. *Id.* ¶ 2.

In April 2008, REI sent Defendants a Franchise Disclosure Document ("FDD") which contained a new RDA (the "2008 Agreement"). Doc. 115 at 3, ¶ 9. Tarrabain received the documents, made handwritten notations in a number of places, signed a few pages, and sent them back to REI. Docs. 110 at 3, ¶ 5, 115 at 3, ¶¶ 11-12. Tarrabain made changes to provisions including franchise fees, monthly fees, and marketing fees, and changed the payment currency from U.S. Dollars to Canadian Dollars. Doc. 16 at 4, ¶ 22. REI contends that Tarrabain's notations constituted a counteroffer reflecting Defendants' assent to the agreement as modified (Doc. 16 at 4, ¶ 21), and that the modified 2008 Agreement replaced the 2003 Agreement (Doc. 115 at 4 ¶¶ 15-16). Defendants assert that

---

consider the rebuttal evidence. *See* LRCiv. 7.2(i) (stating that a failure to respond to a motion "may be deemed a consent to the . . . granting of the motion[.]")

the 2008 Agreement was merely an incomplete sample, not a contract, and that it was never returned to Defendants after it was signed by REI. Doc. 109 at 9.

In early 2015, REI notified Devonshire and other regional developers about planned changes in the structure of its RDAs. Doc. 110 at 6, ¶ 26. Defendants contend that they declined to extend their relationship with REI at this time (*id*. at 6), while REI alleges that Defendants continued their relationship and accepted the benefits of the 2008 Agreement on a month-to-month basis until 2017. Doc. 115 at 5-6, ¶¶ 22-23, 29-39. REI billed Devonshire fees under the schedule in the draft agreement (as modified by Tarrabain), and Devonshire remitted monthly payments. Doc. 115 at 5, ¶ 20. REI twice asked Defendants to enter into a short-term extension of the parties' existing arrangement, but Defendants declined. Doc. 110 at 6, ¶¶ 27-28.

In late June 2017, Tarrabain, Roy, Rowswell, and Kirkham purchased Maxwell Realty Inc. Doc. 110 at 7, ¶ 32. Five Realty Executives subfranchises signed with Maxwell after their subfranchise agreements expired. Doc. 110 at 7, ¶¶ 32-34. REI alleges that Defendants caused other subfranchises to do business with Maxwell, targeted some of its employees to switch to Maxwell, and convinced subfranchise brokers to enter into confidentiality Agreements to prevent REI from gaining knowledge of these activities with Maxwell, all in violation of the 2008 Agreement. REI filed this action in Arizona state court, and Defendants removed it to this Court on August 8, 2018. Doc. 1.

**II.   Summary Judgment Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III.   Discussion.**

REI alleges breach of the 2008 Agreement, tortious interference, and breach of the covenant of good faith and fair dealing. Doc. 16 at 13-16, ¶¶ 71-98. Defendants counterclaim, alleging that REI sought to damage their economic interests and wrongfully "threaten[ed] and intimidate[ed] the Individual Counterclaimants and various Subfranchisees despite knowing that its positions were without legal basis." Doc. 35 at 20-21, ¶¶ 85-98.

**A.   Defendants' Motion (Doc. 109).**

Defendants contend that REI's claims are barred by the Arizona statute of frauds.[3] Doc. 109 at 15. Specifically, Defendants argue that: (1) the 2008 RDA fails to satisfy the statute of frauds because it is unsigned and materially incomplete; (2) the parties' partial performance of the 2008 RDA does not render other terms of the agreement enforceable; and (3) REI's tortious interference and breach of covenant claims also fail under the statute of frauds. *Id.* at 15-21.[4]

**1.   Statute of Frauds – Breach of Contract.**

Under Arizona law, contracts that are "not to be performed within one year of the making thereof" must be in writing and signed by the party against whom enforcement is sought. A.R.S. § 44-101(5). The parties do not dispute that the 2008 Agreement falls

---

[3] The parties agree that Arizona law applies to this case.

[4] Defendants additionally assert that: (1) the alleged obligations of the individual defendants are void under Canadian law; (2) if the 2008 RDA was ever enforceable, REI is equitably estopped from enforcing it; (3) REI cannot state a claim for damages based on expired subfranchise agreements; (4) Defendants have not breached the 2008 RDA or the duty of good faith and fair dealing; and (5) the tortious interference claim fails as a matter of law. *Id.* at 21-25. Because the Court concludes the 2008 Agreement is unenforceable under the statute of frauds, it need not address these arguments.

under the statute of frauds. *See* Docs. 109 at 15-16, 114 at 12.[5] The question, therefore, is whether the agreement is in writing and signed by the party against whom enforcement is sought.

Defendants contend the 2008 Agreement is "missing the most fundamental term in an agreement; the identity of the party, Devonshire, that REI alleges to have breached the agreement." Doc. 109 at 16. Defendants also argue that the Agreement is missing key material developer obligations that are "central terms governing the central purpose of the agreement" (*Id.*), fails to specify the geographical territory covered by the agreement (*id.* at 16-17), and contains numerous incomplete exhibits (*id.* at 17).[6]

To satisfy the statute of frauds, a "contract must state with reasonable certainty the identity of the parties," *W. Chance No. 2, Inc. v. KFC Corp.*, 957 F.2d 1538, 1542 (9th Cir. 1992), and "the subject matter to which the contract relates and the terms and conditions of all of the promises constituting the contract," *Custis v. Valley Nat'l Bank of Phx.*, 375 P.2d 558, 561 (Ariz. 1962). The 2008 Agreement fails these requirements.

The FDD sent to Defendants in 2008, which contained the 2008 Agreement, does not mention Devonshire or the individual Defendants and vaguely refers to "Alberta, Ontario and Prince Edward Island" on the title page. Doc. 109-3 at 2. The 2008 Agreement includes the term "Canada" on the title page, but does not mention a specific territory. *Id.* at 45. REI's Chairman, Richard Rector, testified that REI's RDAs generally cover a "specific territory" and not "the entire country of Canada." Doc. 109-5 at 51. There is a line at the bottom of the first page of the 2008 Agreement for the parties to identify the territory covered by the agreement, but it is blank. Doc. 109-3 at 50. Devonshire is not

---

[5] The 2008 Agreement had a five-year term and therefore could not have been performed within one year, clearly placing the agreement with the statute of frauds. *See Arnold & Assocs., Inc. v. Misys Healthcare Sys.*, 275 F. Supp. 2d 1013, 1020 (D. Ariz. 2003) (noting that promises that "extended approximately 18 months into the future . . . fall squarely within the Statute of Frauds"); *see also* Restatement (Second) of Contracts § 130 cmt. b (1981) (explaining that a contract for a definite term cannot be deemed performable within one year, and therefore is within the Statute of Frauds).

[6] The Court notes that the only contract at issue in this case is the 2008 Agreement. That is the agreement addressed in REI's amended complaint (Doc. 16), and when REI sought to amend the complaint to add claims based on the 2003 Agreement, the Court denied the motion because the 2003 Agreement contained a binding arbitration provision. Doc. 84.

identified as a party to the agreement, nor are its place of business, corporate form, or address included as requested by the form. *Id*; *see also id.* at 88 (regional developer omitted on final page). The only mention of Devonshire in the FDD or the agreement is under a list of REI real estate franchises in Canada. *See* Doc. 109-3 at 110, 114, 117, 120.[7]

What is more, the 2008 Agreement fails to provide crucial information regarding the obligations of Devonshire and its owners. Although the agreement states that the "Regional Developer agrees to satisfy the minimum development obligations . . . in the manner and within each of time periods specified therein," the attached development schedule fails to include information for the cumulative number of operational subfranchises and the cumulative number of open offices. *Id.* at 98. While the cumulative number of sales agents for each year is included, neither Tarrabain nor Rector knew where that number came from. Doc. 109-5 at 58-59. In contrast, the 2003 Agreement clearly identifies Devonshire as the party (Doc. 109-4 at 3), Alberta as the covered territory (*id.* at 25), and is signed by both parties (*id.* at 24-26).

There is nothing in either the 2008 FDD or the agreement indicating that the 2008 Agreement was meant to be a final and binding contract between REI and Defendants. In fact, REI's reply to Defendants' counterclaims admits that the signature line in the 2008 Agreement for "Regional Developer" is blank "because it was intended as a *sample agreement*." Doc. 39 at 4-5, ¶ 16 (emphasis added). Although REI contends that it was a sample agreement only "until Counterclaimants modified it and returned it to REI as an offer," the agreement nevertheless omitted essential terms. *See id.* at 4, ¶ 13. There is no signature for Devonshire, Roy, Rowswell, or Kirkham.[8]

REI does not directly address these deficiencies, arguing instead that because the elements of contract formation are present – an offer by Defendants (through Tarrabain's

---

[7] Similarly, the "Form of General Release" (*id.* at 94-97), "Form of Nondisclosure Agreement" (*id.* at 99-104), and "Personal Guaranty of Development Agreement" (*id.* at 105-08) omit Devonshire's name.

[8] Rector testified that the 2008 RDA was presented to him by his staff, that he did not notice it was incomplete, and that he "probably would have asked some questions" if he had noticed the blanks. Doc. 109-5 at 55-56.

- 6 -

notations) and an acceptance by REI – Defendants are bound by the agreement. Doc. 114 at 13-14. But the issue in this motion is not whether the parties reached an agreement (a point on which they sharply disagree), but whether their agreement, if any, satisfied the Arizona statute of frauds. The statute of frauds expressly applies to an "agreement." *See* A.R.S. § 44-101. It says that an agreement which exceeds one year cannot be enforced in court unless it is "in writing and signed by the party to be charged." A.R.S. § 44-101(5). Thus, REI's arguments about an offer, acceptance, and subsequent performance, while perhaps relevant to the question of whether an agreement was formed, do not answer the statute of frauds question.

The statute requires a writing that identifies the parties to and subject matter of the agreement and sets forth "the terms and conditions of all of the promises constituting the contract." *Custis*, 375 P.2d at 561. REI does not dispute that the 2008 Agreement omits much of this information, but instead contends that the missing terms can be supplied by "context and performance" – in other words, by parol evidence. On this point, REI is just wrong. Arizona cases have long held that where a written contract "is deficient for the reason that essential terms are omitted, *parol evidence is not admissible to supply these missing terms*." *Id.* (emphasis added; citations omitted); *see also Best v. Miranda*, 274 P.3d 516, 518 (Az. Ct. App. 2012) ("even assuming the parties had an oral agreement permitting exercise of the option by notification, evidence of such an agreement would generally be inadmissible under the statute of frauds"); *Nowell v. Andrew Wright Enters.*, 691 P.2d 1107, 1109-10 (Ariz. Ct. App. 1984) (rejecting parol evidence because "Arizona has applied the Statute of Frauds more strictly than California"); *Matter of Estate of Moore*, 669 P.2d 609, 612 (Az. Ct. App. 1983) ("A memorandum, in order to satisfy A.R.S. § 44-101, must state the terms and conditions of all the promises constituting the contract and any deficiency in this regard cannot be supplied by parol evidence."); *Gray v. Kohlhase*, 502 P.2d 169, 171 (Az. Ct. App. 1972) (contract "deficiency cannot be remedied by resort to parol evidence"); *Lyon v. Big Bend Dev. Co.*, 435 P.2d 732, 735 (Az. Ct. App. 1968) (parties may not "resort to the use of parol evidence to construct the terms of an

option agreement relating to real property which agreement is required by the Statute of Frauds to be in writing"); *Wilson v. GMAC Mortg. LLC*, CV 11-00546-PHX-FJM, 2012 WL 780813, at *5 (D. Ariz. Mar. 9, 2012) (same).[9]

The Court finds that the 2008 Agreement – even when the evidence is construed in the light most favorable to REI – does not satisfy the statute of frauds because it fails to "state with reasonable certainty the identity of the parties," *W. Chance No. 2*, 957 F.2d at 1542, and "the subject matter to which the contract relates and the terms and conditions of all of the promises constituting the contract," *Custis*, 375 P.2d at 561. REI cannot supply the missing information with parol evidence. As a result, the 2008 Agreement, even if it is an agreement between the parties, cannot be enforced under the statute of frauds.[10]

### 2. Exceptions to the Statute of Frauds.

Defendants assert that none of the exceptions to the statute of frauds applies in this case (Doc. 109 at 18-19), but REI does not respond to this argument or address the exceptions (*see* Doc. 144). The Court finds that the exceptions do not apply.

Even though the A.R.S. § 44-101 seems to be absolute, Arizona courts recognize limited exceptions to the statute. *See Owens v. M.E. Schepp Ltd. P'ship*, 182 P.3d 664, 667-68 (Ariz. 2008) (citation omitted). These include full performance, in which complete performance of a contract for services "not to be performed within one year, removes the contract from the operation of the Statute of Frauds." *Diamond v. Jacquith*, 125 P. 712, 714 (1912); *Arnold*, 275 F. Supp. 2d at 1020. REI does not argue that the 2008 Agreement

---

[9] REI argues that "[t]he Court can supply the missing terms, even if they are 'essential,' from the admissions and conduct of the parties and with other parol evidence." Doc. 114 at 15. REI cites two cases in support of this assertion, but the first – *In re Kistler* – is provided with no citation and the Court cannot locate it. The second – *AROK Constr. Co. v. Indian Constr. Servs.*, 848 P.2d 870 (Az. Ct. App. 1993) – does not concern the statute of frauds. REI's other principal case, *Schade v. Diethrich*, 760 P.2d 1050 (Ariz. 1988), also does not address the statute of frauds.

[10] Given this ruling, the Court need not address the parties' dispute about whether the agreement was signed and authorized by Tarrabain. *See* Docs. 109 at 17-18, 114 at 15. Furthermore, it appears in light of this ruling that the parties' relationship operated with no enforceable agreement between 2008 and 2017. The terms under which they were operating were different than the 2003 Agreement, and no enforceable agreement was put in its place. The parties do not address this issue in any detail, and its resolution is not necessary for decisions on the other summary judgment issues.

was fully performed, nor can it as REI explicitly terminated the agreement (if it ever was valid) in June 2017, more than a year before its July 2018 end date. Doc. 109-8 at 4 ("this letter constitutes written notice of termination of the RD Agreement, effective immediately upon your receipt[.]").

There is also a part performance exception to the statute, and REI appears to argue that Defendants partly performed their obligations:

> After the negotiation and execution of the 2008 RDA proffered by the Defendants, REI immediately sent an invoice with the new fees. Defendants paid the new rate then, and ever after, without objection. Defendants generated profits from selling and supporting all Alberta REI franchises for seven and half years. Defendants remained silent even after reviewing the 2008 RDA in detail and with the benefit of legal counsel.

Doc. 114 at 14.

Acts of part performance excuse the writing required by the statute of frauds because they provide convincing proof that the contract exists. *Owens*, 182 P.3d at 668. But the doctrine of part performance is equitable, and does not apply "in a suit where only money damages are sought." *Trollope v. Koerner*, 470 P.2d 91, 98 (Ariz. 1970) (citing *Evans v. Mason*, 308 P.2d 245, 248 (Ariz. 1957)); *see William Henry Brophy Coll. v. Tovar*, 619 P.2d 19, 22 (Ariz. Ct. App. 1980) (concluding that the "correct rule" is that if "a party attempting to enforce an oral agreement seeks an equitable remedy, such as specific performance, the equitable doctrines of estoppel and part performance are available to him," but if "he seeks only a legal remedy, such as money damages for breach, they are not."); *Basmajian v. Compass Bank*, No. CV-17-00696-PHX-BSB, 2017 WL 6415358, at *4 (D. Ariz. Aug. 28, 2017) ("the doctrine of part performance does not apply in a suit where only money damages are sought.") (quotation marks and citation omitted).

REI seeks only money damages in its amended complaint. *See* Doc. 16 at 16. Although REI's prayer for relief requests that the Court "[m]ake any Orders or other awards as the Court deems proper under the evidence and the circumstances" (*id.*), such catch-all phrases do not encompass equitable relief. *See Basmajian*, 2017 WL 6415358

("[A] prayer for relief that includes language requesting 'all relief to which the plaintiff may appear to be entitled' or 'such further relief as may be deemed proper' is not somehow magical and all encompassing[.]") (citing *United States v. Hempfling*, 2007 WL 1994069, at *1, *7 (E.D. Cal. Jul. 5, 2007)). Because the amended complaint seeks only money damages, the part performance exception is unavailable. *See Evans*, 308 P.2d at 248; *William Henry Brophy Coll.*, 619 P.2d at 23. Enforcement of the 2008 Agreement is barred by the statute of frauds, and the Court will grant Defendants' motion for summary judgment on REI's breach of contract claim.

### 3. REI's Other Claims.

#### a. Implied Covenant of Good Faith and Fair Dealing.

REI contends that the 2008 Agreement contained a covenant of good faith and fair dealing that Defendants breached when they "impaired or denied REI's expected benefits flowing from" the agreement. Doc. 16, ¶¶ 84-87.[11] Defendants contend that the statute of frauds applies not only to breach of contract claims, but also to "actions based indirectly on the contract." Doc. 109 at 20 (citing *Arnold*, 275 F. Supp. 2d at 1026). As a result, they assert, the statute of frauds bars REI's claim for breach of the covenant of good faith and fair dealing, which is based on a covenant implied in the 2008 Agreement and therefore is based indirectly on the 2008 Agreement. *Id.* REI does not respond. *See* Doc. 109.

The Court finds Defendants' argument persuasive. Arizona courts have held that "the provision in the statute [of frauds] prohibiting any action to be brought on an oral contract within the statute includes action based indirectly on the contract[.]" *Lininger v. Sonenblick*, 532 P.2d 538, 541 (Az. Ct. App. 1975) (citation omitted). A claim for breach of the covenant of good faith and fair dealing implied in the 2008 Agreement clearly is based indirectly on that agreement. As a result, the claim is also barred by the statute of frauds. *See Arnold*, 275 F. Supp. 2d at 1026 ("In this case, the Court found that the Statute of Frauds rendered Plaintiff's contract claim unenforceable. Accordingly, the Court grants Defendant's Motion to Dismiss the related claim of breach of the implied covenant of good

---

[11] Although the amended complaint refers to "contracts," the only contract at issue is the 2008 Agreement, as noted in an earlier footnote.

faith and fair dealing.") (citations omitted).  The Court will grant summary judgment on REI's good faith and fair dealing claim.

### b.   Tortious Interference.

Defendants similarly assert that REI's claim for tortious interference is based indirectly on the 2008 Agreement. Doc. 109 at 20-21. Again, REI does not respond. *See* Doc. 114. The Court agrees with Defendants. In its tortious interference claim, REI alleges that it "had valid contractual relationships and business expectancies related to its relationship with Defendants as a Regional Developer and its subfranchises" (Doc. 16, ¶ 94), a relationship it claims arose out of the 2008 Agreement (*see* Doc. 16, ¶ 29).  The claim further alleges that "Defendants had knowledge of and were aware of the contractual obligations in the [2008 Agreement] and the relationship and expectancy that the subfranchises and salepersons would remain under the REI brand and not move to a competitor." Doc. 16, ¶¶ 94-95. Because the tortious interference claim is based indirectly on the 2008 Agreement, it too is barred by the statute of frauds. *Lininger*, 532 P.2d at 541.

### B.   REI's Motion for Partial Summary Judgment (Doc. 114).

REI moves for partial summary judgment on the liability portion of its claims. Doc. 114 at 17-24. The Court will deny the motion because it is granting Defendants' motion for summary judgment on REI's claims.

### C.   REI's Motion on Defendants' Counterclaims (Doc. 114).

Defendants assert counterclaims for tortious interference with prospective economic advantage and breach of the covenant of good faith and fair dealing. Doc. 35 at 22-23. They contend REI "knowingly and intentionally made false and misleading statements, demands, and threats that were intended to disrupt the Individual Counterclaimants' economic relationships with real estate brokers and agents, and to induce real estate brokers and agents not to do lawful business with the Individual Counterclaimants or entities the Individual Counterclaimants control," and did so in bad faith. *Id.* REI argues that

Defendants fail to state a claim for damages and otherwise cannot establish the elements necessary for their case. Docs. 114 at 25-29.

### 1. Breach of the Covenant of Good Faith and Fair Dealing.

Defendants allege that REI breached the covenant of good faith and fair dealing implied in the 2008 Agreement. Doc. 35 at 21-22, ¶¶ 105-108.[12] As noted above, however, such a claim requires an enforceable contract. *Arnold*, 275 F. Supp. 2d at 1026. Defendants have successfully argued that the 2008 Agreement is unenforceable under the statute of frauds, and they cannot base their covenant claim on it. The Court accordingly will grant REI's motion on this claim.

### 2. Tortious Interference – Damages.

REI contends that the 2008 Agreement waives Defendants' claims for damages. Doc. 114 at 25 (citing 2008 Agreement, Section 13.5 ("Limitations of Legal Actions")). But because the 2008 Agreement is unenforceable, its waiver provision is unenforceable. Doc. 119 at 27.

REI correctly notes that the tortious interference claim is brought only by the Individual Counterclaimants, and not by Devonshire (*see* Doc. 35 at 22, ¶¶ 100-104), and assert that these individuals can recover damages only in the form of profit distributions from Devonshire, which are too speculative. Doc. 114 at 25-26. REI cites this Court's decision in *Two Brothers Distrib. Inc. v. Valero Mktg. & Supply Co.*, 270 F. Supp. 3d 1112, 1131 (D. Ariz. 2017), which held that a plaintiff's hope for a certain level of profitability was not a reasonable business expectancy. But a hope for a certain level of profits is different from the expectancy here – that certain subfranchises would join Defendants in the Maxwell brand. Defendants claim that this expectation was intentionally interfered with by REI's injunctive relief lawsuit that was filed in Canada and dismissed only nine days later. REI has not shown that the expectancy in question was unreasonable as a matter of undisputed fact, as was the mere hope of a certain level of profits in *Two Brothers*.

---

[12] Defendants' allegations concern the "Draft Agreement," which is their name for the 2008 Agreement. *See* Doc. 35 at 13, ¶ 10.

- 12 -

What is more, damages can be recovered for tortious interference with a business expectancy, and the damages claimed by the Individual Counterclaimants do not appear to be "incalculable" and "too speculative." Doc. 114 at 26. Defendants' damages expert, Scott E. Evans, calculates the damages based on a tabulation of revenue derived from lost fees and "reasonable assumptions" regarding expenses and present value discounting. Doc. 119 at 30; *see* Doc. 115-14 at 29-37.[13] Evans identifies three categories of damages: (1) loss of the Masters Realty and Realty Executives Renaissance brokerages; (2) loss of other brokerages and agents that would have joined Maxwell but for REI's conduct; and (3) loss of diverted fees. *Id.* at 33-34. Evans's report includes a detailed explanation of how he reached the total damage amount, along with detailed tables showing his calculations. *See id.* at 44-54. Construing this evidence in Defendants' favor, the Court cannot conclude that the claims for damages are "incalculable" and "too speculative" to support their claims.

### 3. Tortious Interference – Lack of Evidence.

REI argues that Defendants do not have "proof of disputed facts for each element of the tortious interference claim." Doc. 114 at 26. As Defendants note, their basis for their counterclaims is that:

> the 2008 RDA is unenforceable as a matter of law and the Related Subfranchise Agreements expired in 2015. There was therefore no constraint on Counterclaimants' right to (i) associate with Maxwell; (ii) sign the Related Subfranchises to Maxwell; (iii) sign third-party brokerages to Maxwell; or (iv) sign other former REI brokerages to Maxwell, upon the expiration of their agreements with REI.

Doc. 119 at 29. REI challenges the sufficiency of Defendants' evidence as it relates to losing the James Mabey and Kerry Pfannmuller brokerages and other unspecified brokers and agents.

///

---

[13] The report concludes that Defendants suffered lost profits of $1,026,000 due to the loss of sub-franchises and agents and lost profits of $22,000 due to REI's improper withholding of sub-franchise fees owed to Devonshire, resulting in total damages of $1,048,000. Doc. 115-14 at 37.

- 13 -

### a. Mabey and Pfannmuller.

Mabey and Pfannmuller ran two REI subfranchises that expired on October 1, 2017 and August 15, 2018, respectively. Defendants allege REI's threat of litigation prevented Mabey and Pfannmuller from joining Maxwell, and that they joined Century 21 instead.

To be actionable, interference must be with a prospective relationship between the plaintiff and another party. *See Wagenseller v. Scottsdale Memorial Hosp.*, 710 P.2d 1025, 1041 (Ariz. 1985); *Dube*, 167 P.3d at 99; Restatement (Second) of Torts § 766B; *see also Two Bros.*, 270 F. Supp. 3d at 1130. "Before recovery can be had for interference with prospective business relations or for preventing a contract, it must appear that a relationship or contract would otherwise have been entered into." *Marmis v. Solot Co.*, 573 P.2d 899, 902 (Ariz. 1977); *Dube*, 167 P.3d at 101 ("[T]here must be a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship.") (citations omitted). A plaintiff must show "the expectancy constitutes more than a mere 'hope.'" *Id.* at 99.

Defendants note that REI filed an action for injunctive relief in Alberta on June 13, 2017, and then abruptly discontinued it nine days later. Doc. 119 at 31. During this time, REI sent letters to all subfranchises asserting that their agreements had been assumed by REI. *See* Doc. 109-8 at 4 (termination letter to Defendants). Pfannmuller forwarded letters he had received from REI to Tarrabain, who understood this to reflect concern about REI's threatening posture. Doc. 119 at 31. Klingspon specifically testified that Mabey and Pfannmuller expressed an interest in joining Maxwell, but failed to do so "because of the litigation process that was started." Doc. 123 at 55-56. This is enough evidence to create a factual question on whether there was a reasonable expectancy that Mabey and Pfannmuller would join the Maxwell operation.

REI must also know of the business expectancy. *See Dube*, 167 P.3d at 99. The parties do not provide much argument on this point, but based on REI's contacts with the subfranchises – including REI's lawsuit and communications with Mabey and Pfannmuller – the Court cannot conclude as a matter of law that REI could not have

anticipated those brokerages would leave REI and join Maxwell. The jury must decide whether REI knew of the prospective relationships between Mabey, Pfannmuller, and Defendants, and whether it interfered with those prospective relationships by improperly bringing the Alberta injunction action. *See, e.g.*, *Powers v. Leno*, 509 N.E.2d 46, 49 (Mass. App. Ct. 1987) (it is "for the jury to determine whether Leno intentionally interfered with the plaintiffs' relationship by maliciously bringing of continuing the litigation so as to delay and derail the agreement"); Restatement (Second) of Torts § 767 cmt. c (1979) ("Litigation and the threat of litigation are powerful weapons . . . . The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties[.]"). The Court will deny REI's motion on this issue.

### b.  Unspecified Brokers and Agents.

REI also contends that Defendants did not disclose any facts related to their claim that REI "caused a loss of 25 agents and 2 offices that otherwise would have become Maxwell franchisees . . . [and that Defendants] believe that the additional agents and offices would have agreed to associate with Maxwell no later than January 1, 2019." Doc. 114 at 27-28. Defendants contend that they have identified "a specific class of prospective third parties," which includes "former Devonshire subfranchises that, but for REI's interference, would have joined Maxwell upon the expiration of their subfranchise agreements." Doc. 119 at 34. Defendants assert that seeking damages for this group of former subfranchises is not speculative because:

> Counterclaimants believe their contentions regarding lost recruitment are reasonable and supported by the record, in part, because there were a number of Unrelated Sub-franchises with expired and soon-to-expire agreements as of June 2017. Therefore, there were a number of REI brokerages that could have transferred to Maxwell, without contractual impediment, before January 1, 2019.
>
> In fact, the D&P Report states that 133 agents and 11 offices left the REI system between July 2017 and August 2019. Excluding the Masters and

> Renaissance agents and offices, approximately 60 agents and 8 offices left REI after June 2017, per the D&P Report. These departing offices and agents were free to leave REI and choose to associate with a brand other than REI. Counterclaimants contend that their ability to fairly compete in the market to attract these agents and brokerages was constrained and impaired because of the Wrongful Acts.
>
> Counterclaimants have also learned that the Wrongful Acts have negatively stigmatized them in the real estate community where Counterclaimants conduct business, in part due to intentional publicity by REI. Therefore, Counterclaimants contend the Wrongful Acts tarnished their reputation on an ongoing basis and also negatively impacted their ability to attract non-REI franchisees to Maxwell. As a result, Counterclaimants contend that non-REI brokers and agents that would have otherwise joined Maxwell instead associated with third-party brands due to the Wrongful Acts.
>
> Based on the above, and other factors, Counterclaimants believe they would have reasonably been able to recruit, at a minimum, 25 agents and 2 offices to Maxwell prior to January 1, 2019 and were thereby lost revenues[.]

Doc. 115-14 at 35.

Aside from arguing that a number of brokerages were free to leave REI and choose to associate with a new brand, Defendants present little evidence that any of them ever considered Maxwell. The one exception is a declaration from Tarrabain, stating that it was his understanding based on his conversations with North Star Realty's CEO, Dan Gitzel, that North Star would have joined Maxwell in the absence of REI's litigation. Doc. 121 at 4, ¶¶ 11-13.

To prevail on their tortious interference claim, Defendants must not only establish damages with "reasonable certainty," *S. Union Co. v. Southwest Gas Corp.*, 180 F. Supp. 2d 1021, 1050 (D. Ariz. 2002) (citing *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 680 P.2d 1235, 1244-47 (1984)), they must show a "reasonable expectation" and not "a mere 'hope,'" *Bar J Bar Cattle Co.*, 763 P.2d at 548; *Dube*, 167 P.3d at 99. Defendants' argument that a number of brokerages "could have" transferred to Maxwell, without more, is insufficient to meet this standard, even when the evidence is construed in their favor.

The Court will grant REI's motion as it relates to the unspecific brokers, with the exception of North Star Realty.  Doc. 114.

### c. Diverted Fees.

Devonshire asserts that it is owed $27,000 as "full payment of sub-franchise fees owed to it prior to REI's purported termination in late June 2017, irrespective of whether the 2008 Draft RDA is assumed to be enforceable or unenforceable."  Docs. 115-14 at 36, 119 at 35.  Defendants highlight correspondence informing REI that it had no right to collect payments from subfranchises for the June period, and that Devonshire's Canadian counsel wrote REI that some subfranchises appeared to have "mistakenly paid their June 2017" fees to REI and requested an accounting of all funds received by REI.  Doc. 119 at 35.

REI notes that with the purported assignment of Defendants' subfranchise agreements, it "stepped into the shoes" of Devonshire and acquired all rights to any money owed to Devonshire upon termination of the 2008 Agreement.  Doc. 114 at 28 (citing *Highland Village v. Bradbury & Stamm*, 195 P.3d 184 (Ariz. Ct. App. 2008); *Jefferson Loan Co. v. Session*, 938 A.2d 169, 179 (N.J. Super. Ct. 2008).  But as the Court has determined, the 2008 Agreement is unenforceable, which makes void the assignment on which this purported authority is based.  *See* Doc. 115-12 at 2.  REI also argues – for the first time in reply – that "if the 2008 RDA is void then the 2003 Agreement properly allowed for assignment."  Doc. 124 at 10.  The Court will not address arguments made for the first time in a reply brief.  *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam); *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006)

Defendants note that their claim "is based on the fundamental principle that – irrespective of whether the parties were operating under the 2008 RDA or an informal arrangement – [they] are entitled to be paid fees that accrued *before* REI's purported assumption of the subfranchise agreements."  Doc. 119 at 25.  REI does not present any authority to the contrary.  Construing the evidence in Defendants' favor, the

Court finds a question of fact as to whether Defendants are owed $27,000 in diverted fees. The Court will deny REI's motion on this issue.

**IT IS ORDERED:**

1. Defendants' motion for summary judgment (Doc. 109) is **granted**.
2. Plaintiff's motion for partial summary judgment on its claims (Doc. 114) is **denied**.
3. Plaintiff's motion for summary judgment on Defendants' counterclaims (Doc. 114) is **granted in part and denied in part** as set forth above.
4. Plaintiff's motion for leave to file rebuttal evidence (Doc. 126) is **granted**.
5. Because of the COVID pandemic, the Court has many jury trials waiting to be scheduled and therefore cannot schedule trial in this case now.  Within 14 days of this order, the parties shall file a joint memorandum stating (a) the anticipated length of the trial and (b) the dates between now and the end of May 2021 when they are available for trial.  The Court will schedule trial and a final pretrial conference as soon as the pandemic and its trial backlog allow.

Dated this 26th day of August, 2020.

_David G. Campbell_
David G. Campbell
Senior United States District Judge